## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JACQUELINE ASSISE and ROBERT ASSISE; individually and on behalf of all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**HARLEY-DAVIDSON INC.,**<br><br>**Defendant.** | Case No.:<br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Jacqueline and Robert Assise bring this class action for injunctive relief against Harley-Davidson Inc. ("Harley-Davidson", "Harley", or "Defendant") on behalf of themselves and a Class (defined below) of all other similarly situated indirect purchasers under Rule 23 of the Federal Rules of Civil Procedure, Sections One and Two of the Sherman Act (15 U.S.C. §§ 1, 2), and Section Sixteen of the Clayton Act (15 U.S.C. § 26); as well as damages pursuant to state antitrust law allowing indirect-purchaser remedy under this Court's supplemental jurisdiction against Defendant. It will show the Court as follows:

## NATURE OF THE ACTION

1.      This is an antitrust action directed at Harley-Davidson's anticompetitive conduct: Harley-Davidson used its warranty to try to force Harley owners to use its own parts, in preference to the many quality aftermarket parts available for its motorcycles.  It did so in plain contravention of law, including the Magnuson-Moss Warranty Act. This conduct constitutes a violation of federal and state antitrust laws, as detailed below.

2. Harley-Davidson is one of the most recognizable vehicle brands in the world, and indeed one of the oldest. The company will celebrate its 120th year in operation next year, and accounts for approximately half of all roadgoing motorcycles with engine displacements in excess of 601cc.

3. Because of the longevity and ubiquity of its motorcycles, and because of the loyalty of the Harley-Davidson faithful and their willingness to keep older Harley-Davidsons on the road for generation after generation and to customize them in seemingly infinite ways, there is a vast aftermarket for parts to repair and customize Harleys.

4. However, Harley-Davidson itself makes approximately 15% of its considerable annual revenue from parts. In order to maximize its parts revenue and profit, Harley-Davidson has used its warranty to try to force those Harley owners under warranty to use only Harley-Davidson's own parts.

5. In June 2022, the Federal Trade Commission stepped in to force Harley-Davidson to stop this unlawful practice. The Federal Trade Commission, however, lacks the authority to recover consumers' damages. Because Harley-Davidson illegally tied its motorcycles and, specifically, the factory warranties that go with them to its parts, Harley-Davidson's parts have been overpriced, forcing the company's loyal following to pay this cost, which they should not have. In this litigation, they seek to recoup from Defendant that overpayment.

## THE PARTIES

6. Plaintiffs Jacqueline and Robert Assise are residents of Cook County, Illinois, and purchased a new 2019 Tri-Glide Harley-Davidson motorcycle on July 12, 2019. They purchased

Harley-Davidson compatible parts on numerous occasions from July 2019 through July 2021, paying a total of $2,868.52 for parts to date, not including taxes or labor.[1]

7. Defendant Harley-Davidson Inc. manufactures motorcycles and motorcycle parts. The company is headquartered at 3700 W. Juneau Ave., Milwaukee, Wisconsin, and it maintains a factory in York, Pennsylvania.

## JURISDICTION AND VENUE

8. Plaintiffs bring this lawsuit for injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. § 1337(a).

9. This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the causes of action arise under the laws of the United States. This Court also has supplemental jurisdiction over the damage causes of action asserted under state law pursuant to 28 U.S.C. § 1367 because these causes of action are so related to the causes of action within the Court's federal question jurisdiction that they form part of the same case or controversy.

10. Defendant is subject to personal jurisdiction in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, because it transacts business in this District.

11. This Court has personal jurisdiction over Plaintiff because Plaintiff is a resident of this state and purchased and used their vehicle here.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(d) and 15 U.S.C. §§ 15 and 22 because Defendant is doing business in, has and had agents in, and is found to transact business in this District.

---

[1] See Exhibit A.

3

## BACKGROUND

### A.    Harley-Davidson Motorcycles

13.    Harley-Davidson Inc. was founded in Milwaukee, Wisconsin in 1903 and, by 1920, had quickly become the largest motorcycle manufacturer in the world. Along with Indian Motorcycle Inc. ("Indian"), Harley-Davidson is one of only two American motorcycle brands to have survived the Great Depression.

14.    Around the 1970s, Harley-Davidson faced waning popularity and near-bankruptcy in the wake of cost-cutting measures that resulted in low quality bikes, as well as the introduction of the so-called Universal Japanese Motorcycle ("UJM") – a new category of very similar, accessible motorcycles manufactured by the big four Japanese motorcycle manufacturers – Honda, Kawasaki, Yamaha, and Suzuki; which appealed to American consumers.

15.    In the next decade, however, Harley-Davidson managed to make a complete turn-around, saving itself from ruin and vaulting its status and image into what they are today. It did so via its adoption of the large-displacement bicycle, helped expeditiously by the Reagan administration's tariffs against foreign imports of this kind of model. This kind of motorcycle was easily distinguishable, moreover, from the UJM, creating a whole new separate category of bike predominated by a single manufacturer whose brand now became shorthand for the American motorcycle.

### B.    Harley-Davidson's Warranty

16.    As of June 2022, Harley-Davidson sold as a bundle with its motorcycles warranties valid for twenty-four months, "starting from the earlier of (a) the date of the initial retail purchase

4

and delivery of the motorcycle from an authorized Harley-Davidson dealer; or (b) the third anniversary of the last day of the model year of the motorcycle."[2]

17.    Harley-Davidson's 2021 warranty stated, in relevant part, that:

•    "Genuine Harley-Davidson parts are engineered and tested specifically for use on your motorcycle. Insist that your authorized Harley-Davidson dealer uses only genuine Harley-Davidson replacement parts and accessories to keep your Harley-Davidson motorcycle and its limited warranty intact."

•    "This limited warranty will not apply to any motorcycle … 1. Which has not been operated or maintained as specified in the owner's manual… 4. Which has off-road or competition parts installed to enhance performance, a trailer hitch, or has other unapproved modifications (even if these modifications include genuine Harley-Davidson parts and accessories that are not approved for use on your motorcycle). These modifications may void all or parts of your new motorcycle limited warranty. See an authorized Harley-Davidson dealer for details."

•    The "[u]se of aftermarket performance parts may void all or parts of your limited warranty. See an authorized Harley-Davidson dealer for details" and that "the use of parts and service procedures other than Harley-Davidson approved parts and service procedures may void the limited warranty."

•    In "[s]ome countries, states or other locations may require all regular maintenance and service work to be done by an authorized Harley-Davidson dealer for your warranty to remain in effect. Check with your local Harley-Davidson dealer for local requirements."

---

[2] See Exhibit B attached hereto ("FTC Complaint")

### C.    **Warranty Coverage**

18.    Even when customers have endeavored to obey Harley-Davidson's dictate that they only choose Harley-Davidson branded Compatible Parts, they still risk losing warranty coverage, which the company seeks to limit even beyond the scope of its language.

19.    For example, according to comments in public forums, consumers have experienced situations where their dealers record and report repairs that ought to be covered by their warranty as non-warranty repairs, claiming that the customer has impermissibly altered their bike by performing modifications unrelated to the issue for which the customer has brought in their bike,[3] including simply mounting a flag.[4]

20.    Upon information and belief, the basis of which is public comment by persons with knowledge of dealer practices, Harley incentivizes the dealers to do this by structuring repair reimbursements – which reportedly can be up to 30 cents on the dollar – differently depending on whether they are reported as covered or not. Repairs will get reimbursed immediately for uncovered repairs, but for warranty repairs, dealers must wait up to ninety days to be compensated.[5]

21.    By incentivizing the dealers to void warranties, thus "flipping warranty situations into non-warranty situations,"[6] Harley-Davidson is able to profit in two ways – first, by dodging the repair labor cost, and then making the part into revenue.

---

[3] https://youtu.be/eIxCLZl5I7M at 6:40 (discussing comment by individual called Jim Redmond)

[4] *Id.* at 6:30 (discussing comment by individual called Tim Barnett)

[5] *Id.* at 8:20

[6] *Id.* at 9:20

D.    **The Parts Universe**

22.    The Parts at issue in this suit are those compatible with Harley-Davidson bike models. Because Harley monopolizes the large American-manufactured bikes market, such parts generally refer to those compatible not only with Harley bikes but also with large cc American bikes in general. One notable differentiator between Harley compatible parts and parts compatible with, say, Japanese bikes are is the use of imperial or SAE units as opposed to metric units. There is, to be sure, a multitude of parts manufacturers that make and sell such parts, which in part will be marketed as Harley-compatible. Various online retailers, for example, have sections specifically labeled as Harley-Davidson compatible under which both Harley-branded and third-party manufactured parts are sold. Such third-party parts, which may often be priced lower than Harley-branded parts, are a direct threat to the revenue that Harley enjoys from its parts segment – a threat that Harley has scrambled to control through its unlawful, anti-competitive tying scheme.

## TRADE AND COMMERCE

23.    Harley has sold and continues to sell motorcycles and parts in the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.  Harley's annual revenue exceeds $5 billion dollars, and it is the single largest maker of motorcycles for the U.S. market, including roughly a majority of roadgoing motorcycles with engine displacements over 601cc.

24.    Harley's business activities were intended to have and have had a substantial effect on interstate trade and commerce in the United States, including in this judicial district.  There are Harley-Davidson motorcycles registered and on the road in all fifty states and the District of Columbia. These motorcycles, inevitably, will need repairs.  Independent parts makers make a dizzying array of repair parts as well as performance and cosmetic upgrade parts for Harley-Davidson motorcycles.  Despite this, Harley-Davidson has kept a larger share of the parts market

7

for itself, and commanded higher prices for its repair parts, because it has used its warranty to unlawfully force Harley owners to use its own branded parts.

**RELEVANT MARKET**

**A.    The New Market For American-Made Large, Roadgoing Motorcycles**

25.     There are two relevant product markets in this instance.  The first is the market for motorcycles, specifically American-made, new, large roadgoing bikes, which are sold as a bundle with factory warranties. The second relevant product market is the market for motorcycle parts compatible with Harley-Davidson motorcycles (hereinafter "Compatible Parts.") Compatible Parts are distinguishable from parts for other brands of motorcycle by their technological compatibility.

26.     Large, roadgoing motorcycles are a separate product market from non-roadgoing motorcycles, and likewise American-made motorcycles are a separate product market from non-American made motorcycles.  American-manufactured, large roadgoing motorcycles thus constitute their own separate product market.

27.     Roadgoing motorcycles are registered with the Department of Motor Vehicles in the state where the owner resides, and can be ridden on the road.  A bike that cannot be registered cannot be legally ridden on the road, and for that reason is not a substitute.  Dirt bikes, for example, suitable only for off-road use, serve a different function to their riders and so constitute a different market.  Prices of dirt bikes thus do not discipline the price of large roadgoing motorcycles, and vice versa.

28.     Nor do small displacement motorcycles constitute part of the same market as large, roadgoing motorcycles.  Harley-Davidson makes no roadgoing bike with an engine displacement smaller than 883cc.  Smaller displacement engines are almost universal in dirt bikes, and common in certain kinds of road bikes, including sport bikes, a market dominated by the aforementioned Big 4 Japanese makers.  Smaller motorcycles, however, lack the passenger and cargo capacities of

8

large roadgoing motorcycles, lack the torque and horsepower that only a larger engine can offer, and lack the look and feel of large roadgoing motorcycles. For this reason, they attract different buyers than small displacement motorcycles. Thus, the prices of smaller bikes do not discipline the prices of large roadgoing motorcycles, and vice versa. Harley has in fact recognized the separateness of large roadgoing motorcycles in its public reporting, in which it defines its own market share by roadgoing motorcycles with engine displacement larger than 601cc.

29. New, large roadgoing motorcycles are sold as a bundle with manufacturer's warranties. Manufacturers' warranties are neither useful nor available without the motorcycle they cover. The availability and terms of manufacturer warranties distinguish new large roadgoing motorcycles from used large roadgoing motorcycles.

30. Consumers have difficulty understanding the lifecycle pricing of a motorcycle. Because new large roadgoing motorcycles are sold bundled with manufacturer's warranties, riders aim to reduce the cost of ownership to the replacement of consumables: gas, oil, tires, and the like which are normally and naturally used up in the use of the motorcycle, some of which many riders are able and willing to replace themselves. The need for replacement parts is difficult to forecast for any given motorcycle because the need for replacement arises from damage or wear events that are hard to predict, and because the rider has purchased a warranty to defray these costs. Accordingly, when entering into a contract to buy a new Harley-Davidson motorcycle, Plaintiffs and the members of the Class had little ability to forecast the cost of being locked into Harley-Davidson Compatible Parts and losing the opportunity to buy competitors' Compatible Parts.

31. Next, American-made motorcycles are distinguishable from non-American motorcycles, even within the aforementioned category of large, roadgoing bikes. They are a discrete submarket that does not experience cross-elasticity of demand with, for example,

Japanese-manufactured large, roadgoing, motorcycles. Indeed, American-made motorcycles – both Harley and its smaller competitors in this space – enjoyed their own dedicated publication for thirty years with American Iron Magazine, thereby demonstrating that there was a distinct ridership and following for American-made motorcycles, sufficient to support its own universe of print media.

32.     In contrast to other kinds of vehicles, like cars, for example, motorcycles elicit a specific kind of cultural commitment from their consumers. Motorcycle riders routinely form organizations centered around shared homes and/or cultural heritage, and the bikes that they ride frequently serve as vehicles to express their patriotism. Indeed, Harley-Davidson offers a variety of American flag kits and other kinds of patriotic memorabilia that can be attached to their motorcycles or worn by riders. The consumer base of Harley-Davidson would find it incongruous with their belief structure to ride a Japanese make of bike, even if such a motorcycle was for all intents and purposes the same thing as Harley's version and similar or cheaper in price.

33.     The company's loyal consumer base is organized into the so-called "Harley Owners Group," or "HOG" – a Harley-sponsored fan club (the logo of which includes a bald eagle) that seeks to brand Harley Davidson as a distinctly American icon, specifically to appeal to an all-American fan base seeking to celebrate via their motorcycles a shared national heritage.[7] Indeed, the all-American branding effort was a conscious one on Harley's part as part of its 1980s comeback wherein the company sought to distinguish itself from the increasingly popular Japanese motorcycle. As an American-based, American-manufactured brand, it was able to capture new consumers to the world of motorcycling that would not have otherwise joined.

_____

[7] https://books.google.com/books?id=L5QgZxUgVkYC&pg=PA36#v=onepage&q&f=false

10

34.     An 1995 ethnography of Harley riders found that the group qualified as a "subculture of consumption," or "a distinctive subgroup of society that self-selects on the basis of a shared commitment to a particular product class, brand, or consumption activity."[8] The study showed how this burgeoning class of riders, bolstered by Harley's own marketing efforts and establishment of its so-called Harley Owners Group, centered around Harleys as a distinctly American form of bike. Japanese motorcycles would only be bought by Harley aspirants as temporary stopgaps until they could afford the much more expensive Harley. While other American brands do figure in this market, notably Indian, which markets itself as the oldest American brand of motorcycle, Harley's scale dwarfs these competitors and is thus the most visible choice to these consumers who will only ride American.

35.     If a Harley bike is totaled, or breaks down beyond repair, its rider will not shop around for its replacement – he will rather buy another Harley automatically. While some niche American-made alternatives, like Indian, do exist, only Harleys elicit the prestige and cache of a distinctly American heritage brand. Their presence dwarfs any other American brand in the market, with their nearest competitors in terms of market size being the Japanese Big 4, and then BMW. Other American brands are comparatively unknown and do not figure in the general awareness of the American biking community. Harleys, moreover, can be bought in an abundance of colors, makes, and configurations.

### B.     The Compatible Parts Market

36.     The Compatible Parts market herein is defined by compatibility, specifically with Harley-Davidson motorcycles. To repair a Harley-Davidson motorcycle, the owner must purchase a Compatible Part.  The prices of parts that are not compatible with Harley-Davidson motorcycles

---

[8] Exhibit C at 43 (attached hereto)

cannot and do not discipline the prices of parts that are compatible with Harley-Davidson motorcycles.

### C. **Geographic Markets**

37.     The United States is the relevant geographic market for both large roadgoing motorcycles and parts.

38.     Harley-Davidson distributes its motorcycles throughout the U.S. through a network of independently-owned, authorized dealerships.

39.     Harley-Davidson also distributes Compatible Parts throughout the United States through its dealer network as well as via its online website.

### D. **Barriers To Entry**

40.     There are significant barriers to entry in both relevant markets that allow Harley to protect and maintain its market power. The first is technical and regulatory.  Motor vehicles for operation on public roads are complex and heavily regulated machines.  Engineering a new make of large, roadgoing motorcycle from scratch is an expensive engineering challenge, requiring formidable economic backing.  Harley-Davidson's significant competitors are the four large Japanese makers, three of which are conglomerates making non-motorcycle products for a global market – Honda, Suzuki, and Yamaha.  Effective entry into the relevant markets would require developing expertise in design engineering in addition to obtaining certifications and approvals necessary to U.S. road registration, including for safety and emissions.

41.     Even a new entrant with the engineering expertise could have no guarantee of success because of the importance of brand identity in the market. Harley-Davidson has a 119-year-old brand.  Because of the importance of brand heritage in large, roadgoing motorcycles, most new entries by American and even British makers have been revivals of pre-WWII brands, including American names Henderson (which failed after two years), the aforementioned Indian

12

(backed by offroad giant Polaris), and, among British marques, Triumph. There are only a limited number of available defunct American motorcycle brands that have names that would still resonate among potential customers today.

42.     A new entrant would also need to secure distribution, contending with the legal restrictions many states place on road vehicle dealerships and with the existing dealer networks that could not afford to alienate their suppliers.

43.     The capital outlay necessary to secure a recognizable brand or build one from scratch, to design and market a new motorcycle, and secure nationwide distribution, are very formidable.  Most major motorcycle makers in the U.S. other than Defendant (with its venerable brand and fanatical following) have the backing and name of companies with an array of products in markets across the globe.  A new entrant to displace Harley-Davidson's dominance would need to be prepared to bear a large initial investment and keep that capital at risk for a protracted period to build the name necessary to become sustainable and profitable.

44.     Harley-Davidson's own conduct challenged herein created a barrier to entry into the Compatible Parts. Harley-Davidson's conditioning of its warranty on the use of Harley-Davidson parts provided a powerful disincentive to dealers stocking and riders choosing competing Compatible Parts.  A new entrant would have to contend with an already robust market in Compatible Parts for those Harley owners who were not covered by manufacturer warranties or intended to void them; and the new entrant would have no more access to the Class Members, those owners still under warranty, then any of the existing competitors in the Compatible Parts market.

## HARLEY'S MARKET POWER

45.     Harley-Davidson has substantial market power in both relevant markets.

46.     Harley-Davidson has a monopoly in the market for large roadgoing motorcycles. Its market share in this market, according to its own public reporting, is 44.5%.[9]  The remainder of the market is fragmented, and indeed the next four firms in market share are the aforementioned Japanese makers – Honda, Suzuki, Yamaha, and Kawasaki.

47.     Harley-Davidson also possesses substantial market power in the market for Compatible Parts. Its next closest competitor, parts seller Custom Chrome, has an annual revenue of approximately $21.2 million,[10] while Harley's revenue for parts in 2021 equaled approximately $741.8 million.[11] Assuming that the U.S. market share for parts holds an equivalent ratio to said market share for new motorcycle registrations, its total U.S. revenue for parts would be approximately $482.2 million – almost 23 times the size of its nearest competitor.

48.     In its February 2022 guidance, as published in its 2021 10-K, Defendant stated that it expected "revenue growth from parts and accessories and apparel and licensing" and that "***growth in revenue from higher-margin parts and accessories*** and apparel, will more than offset the expected cost inflation across the supply chain." (emphasis added).[12]

## HARLEY'S ANTICOMPETITIVE TYING CONDUCT

49.     To maintain its dominant position in the market for parts, Harley uses its monopoly power in the large, roadgoing American bike market (and specifically the manufacturer's warranty bundled with the new bike) to coerce customers not to purchase Compatible Parts from its competitors. Up until the month before this filing, Harley-Davidson did this by unlawfully tying

---

[9] As reported in the company's 10-K for the year ending Dec. 31, 2021, available at
https://www.sec.gov/ix?doc=/Archives/edgar/data/793952/000079395222000014/hog-20211231.htm

[10] https://www.datanyze.com/companies/custom-chrome/28581444

[11] *Id.*

[12] *Id.*

its warranty to its parts by requiring customers who bought its bikes to only use Harley-Davidson's Compatible Parts – or else risk voiding the warranty. This is illegal under the Magnuson-Moss Warranty Act. In June 2022, the Federal Trade Commission ordered Harley to stop this practice going forward, but did not and indeed lacks the authority to recoup the past overpayments for parts from all affected Harley owners.

50. As a result of Harley-Davidson's anticompetitive conduct, its faithful following of Harley owners has been harmed in two ways. First, Harley-Davidson has been able to and has charged more for its parts than it would have been able to, had it limited its warranty terms to what the law allows. Second, Harley-Davidson's riders have been deprived of access to the full range of aftermarket parts that the market could support. While there is already a robust market for parts, Harley owners whose bikes were under warranty were not free to choose from that array of parts because the choice to use competitor parts came with the threat of loss of warranty coverage.

## INJURY TO COMPETITION

51. Harley-Davidson's anticompetitive practices in tying the bikes and warranties to the parts have restrained trade, and have preserved and entrenched Harley-Davidson's market power. Harley-Davidson's conduct has injured competition in the market for parts and has caused injury to owners in the form of anti-competitive pricing for parts.

52. The injury to competition has caused injury to its competitors, as well as antitrust price injury for its independent dealers – injury that is then passed on, all or in part, to the ridership in the form of anti-competitive pricing. Harley bike owners have paid higher prices for parts because of the tying, which has also impermissibly limited competitive choice for the riders.

53. Harley-Davidson's tying was unlawful under the Magnuson-Moss Warranty Act. It had and could have no legitimate business or pro-competitive justifications, because it is

15

unlawful. Unless injunctive and equitable relief is granted, Harley-Davidson may resume its unlawful conduct in whole or in part, and continue the resulting injury to competition.

## CLASS ACTION ALLEGATIONS

### A.      Federal Injunctive Class Claims

54.      The injunctive claims under the Sherman and Clayton Acts are brought on behalf of a class of indirect purchasers of Harley-Davidson motorcycles and parts ("Federal Injunctive Class") under Fed. R. Civ. P. 23(a) and 23(b)(2) encompassing:

> All United States owners of a Harley-Davidson roadgoing motorcycle under factory warranty who purchased Compatible Parts from August 1, 2018 through the present ("Class Period").

#### 1.      Rule 23(a) Prerequisites

55.      Prosecution of the claims of the Federal Injunctive Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedures are met:

(a)      The number of persons in the Federal Injunctive Class is in the thousands, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable. Joinder also is impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and Plaintiffs' lack of knowledge of the identity and addresses of all members of the Class.

(b)      There are numerous questions of law and fact arising from Harley-Davidson's restraint of trade which are common to the members of the Federal Injunctive Class. These include, but are not limited to, common issues as to (1) whether the Defendant has engaged in tying, restraint of trade or monopolization; and (2) whether this conduct, taken as a whole, has materially caused continuing and threatened antitrust price injury to be inflicted on indirect purchasers in the Class, as well as denial of free competitive choice.

16

56.     Plaintiffs purchased Compatible Parts at artificially inflated prices as a result of Harley-Davidson's anticompetitive, unlawful conduct. Plaintiffs' interests are coincident with and not antagonistic to those of the other members of the Federal Injunctive Class. Plaintiffs are members of the Federal Injunctive Class, have claims that are typical of the claims of the Class members, and will fairly and adequately protect the interests of the Class. Plaintiffs and the members of the Class are similarly or identically harmed by the same systematic and pervasive concerted action.

57.     Plaintiffs and Plaintiffs' counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of Plaintiffs and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of the Class Representative Plaintiffs and the other members of the Class.

### 2.     Rule 23(b) Prerequisites

58.     The prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(2) is appropriate because Defendant has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

59.     In addition, the prosecution of the claims of each State Damages Class as a class action pursuant to Rule 23(b)(3) is appropriate because:

(a)     Questions of law or fact common to the members of each State Damages Class predominate over any questions affecting only its individual members; and

(b)     A class action is superior to other methods for the fair and efficient resolution of the controversy.

17

## FIRST CLAIM FOR RELIEF
### (Tying – Sherman Act § 1 and Clayton Act § 3)

60.     The allegations in the preceding paragraphs are incorporated as if fully stated herein.

61.     Harley-Davidson has engaged in an unlawful tying scheme in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

62.     Motorcycles and warranties are sold as a bundle and are a single product for purposes of the relevant product market.  The manufacturer warranty for a new Harley-Davidson motorcycle does not have independent use or value apart from the motorcycle it covers, and they are not sold separately.

63.     Harley-Davidson has tied the sale of its motorcycles and manufacturer's warranty (the tying product) to the purchase of its Compatible Parts (the tied product) by conditioning the warranty on the use of its own parts, in violation of the Magnuson-Moss Warranty Act. The possibility of voiding the manufacturer warranty, a valuable component of the bundle sold with the new bike, gave both dealers and riders a strong incentive to forgo the opportunity to purchase non-Harley-Davidson Compatible Parts, and instead to use Defendant's Compatible Parts, even when they were priced at a premium.

64.     The motorcycle (and the manufacturer warranty that covers it) is a separate and distinct product from the parts used to repair or customize the motorcycle. The existence of numerous makers and sellers of Compatible Parts separate from Harley-Davidson and its distribution network demonstrates the separateness of the two product markets.

65.     At all times relevant to this action, Harley-Davidson had market power in the market for the sale of Compatible Parts in the United States. Upon information and belief, the basis

18

of which is information regarding the market share of Harley's largest competitor, Custom Chrome, Harley-Davidson sells at or near 80% of Compatible Parts in the United States. Moreover, there are high barriers to entry in the market for Compatible Parts, including both technological and regulatory barriers.

66.    Harley-Davidson uses its market power in the market for large roadgoing motorcycles (and the manufacturer warranties that cover them) to coerce dealers to supply and riders to purchase Harley-Davidson's own Compatible Parts instead of competitors' Compatible Parts, at supra-competitive prices, and as a result these higher prices are charged to the dealers then passed on to end users.

67.    Harley-Davidson's conduct has stifled competition on the merits in the Compatible Parts market.

68.    The amount of interstate commerce affected by Harley-Davidson's tying scheme is substantial. In 2021, Harley-Davidson had consolidated revenues in excess of $5 billion, and about 15% of its revenues are for parts.

69.    Harley-Davidson's conduct in conditioning its warranty on the purchase of its Compatible Parts constitutes an illegal tying agreement, and is a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 3 of the Clayton Act (15 U.S.C. § 14) or, in the alternative, is unlawful under the rule of reason, in that any purported pro-competitive justification for the tie is null and void, and is substantially outweighed by the anticompetitive effects in the Compatible Parts market.

70.    There are no legitimate business or pro-competitive justifications for Harley-Davidson's conduct and any purported legitimate business justifications are mere pretexts. This specific conduct is a violation of the right to repair embodied in the Magnuson-Moss Warranty

Act. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

71.    If not enjoined, Harley-Davidson would be able to and could in the future return to engaging in anticompetitive conduct that will further injure end users and competition.

72.    As a substantial, proximate and immediate result of Harley-Davidson's anticompetitive and unlawful actions, Plaintiffs and members of the proposed Federal Injunctive Class have been injured in their business or property, and continue to be threatened by such harm.

73.    Plaintiffs and members of the proposed Federal Indirect-Purchaser Injunctive Class seek an injunction prohibiting the Defendant's anticompetitive practices pursuant to Clayton Act § 16, 15 U.S.C. § 26.

<u>SECOND CLAIM FOR RELIEF</u>
**(Monopoly Tying –Sherman Act § 2 and Clayton Act § 3)**

74.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

75.    Harley-Davidson has engaged in an unlawful tying scheme that is intended to maintain and increase its monopoly power, or dangerous probability of acquiring monopoly power, in the Large, Roadgoing Motorcycle and Compatible Parts Markets.

76.    Harley-Davidson entered into a Consent Agreement with the Federal Trade Commission on June 23, 2022, agreeing to findings that it had violated the Magnuson-Moss Act's anti-tying provision when it forced warranty-holders to buy only Harley-Davidson branded parts or lose warranty coverage.

77.    Because warranty-holders represented, effectively, any consumer who had bought a new Harley-Davidson bike within 24 months prior to their seeking repairs, Harley-Davidson was thus able to hold hostage this segment of potential customers, forcing them to only choose from

20

branded repair parts and thereby artificially increasing demand for them so that it could charge higher prices.

78.     Harley-Davidson's conduct violates Section 2 of the Sherman Act and Section 3 of the Clayton Act.

79.     As a substantial, proximate, and immediate result of Harley-Davidson's anticompetitive and unlawful actions, Plaintiffs and members of the proposed Federal Injunctive Class have been injured in their business or property, and continue to be threatened by such harm.

80.     Plaintiffs and members of the proposed Federal Indirect-Purchaser Injunctive Class seek an injunction prohibiting the Defendant's anticompetitive practices pursuant to Clayton Act § 16, 15 U.S.C. § 26.

## THIRD CLAIM FOR RELIEF
### (Aftermarket Tying –Sherman Act § 2 and Clayton Act § 3)

81.     The allegations in the preceding paragraphs are incorporated as if fully stated herein.

82.     Harley-Davidson has engaged in an unlawful tying scheme that is intended to maintain and increase its dangerous probability of acquiring monopoly power in the Compatible Parts aftermarket.

83.     For the first two years after purchase, buyers of new Harley-Davidson bikes, bundled with warranties, have been forced to shop for only Harley-Davidson branded Compatible Parts if they wish to keep their warranties intact.

84.     The FTC has already found in their June 2022 Consent Agreement and Complaint that such a tying scheme is illegal under the Magnuson-Moss Act.

85.     There is no benefit to consumers in forcing them to maintain their motorcycles with only Harley-Davidson branded Compatible Parts as opposed to third-party Compatible Parts.

21

Rather, the only benefit of such a scheme is to the company itself, who has indicated explicitly in its SEC disclosures that their Compatible parts represent a key segment of revenue that is higher in margin.

86.     Consumers were not adequately warned that their purchase of a new Harley-Davidson motorcycle would lock them into using only Harley-Davidson branded parts for any needed repairs within the first two years after their purchase.

87.     Plaintiffs and members of the proposed Federal Indirect-Purchaser Injunctive Class seek an injunction prohibiting the Defendant's anticompetitive practices pursuant to Clayton Act § 16, 15 U.S.C. § 26.

### B.     State Indirect-Purchaser Class Claims

88.     The allegations in the preceding paragraphs are incorporated as if fully stated herein.

89.     Pursuant to this Court's supplemental jurisdiction, Plaintiffs and the proposed Class also seek damages under state antitrust statutes in 27 states and the District of Columbia, which accord damage remedies to indirect purchasers of Harley-Davidson Compatible Parts suffering passed-on antitrust price injury due to Harley-Davidson's unlawful conduct ("Indirect Purchaser Jurisdictions").

90.     These claims are prosecuted by a Class of Indirect Purchasers of Harley-Davidson Compatible Parts ("State Indirect Purchaser Damage Class" or "the Class") under Fed. R. Civ. P. 23(a) and 23(b)(3) encompassing:

> All United States owners of Harley-Davidson roadgoing motorcycle under factory warranty who indirectly purchased Harley-Davidson Compatible Parts from August 1, 2018 through the present ("Class Period").
>
> The Class is organized into Subclasses according to the Indirect-Purchaser Jurisdictions specified below.

22

### 1. **Rule 23(a) Prerequisites**

91.     Prosecution of the claims of the State Indirect Purchaser Damage Class and its Sub-Classes as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

      (a)     The number of persons in the Class is in the thousands, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable. Joinder also is impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and Plaintiffs' lack of knowledge of the identity and addresses of all members of the Class.

      (b)     There are numerous questions of law and fact arising from Harley-Davidson's restraint of trade which are common to the members of the Class. These include, but are not limited to, common issues as to (1) whether the Defendant has engaged in a tying arrangement, in restraint of trade or by using its monopoly in the large, roadgoing American motorcycle market to maintain and extend its monopoly in the market for Compatible Parts in the Indirect Purchaser Jurisdictions; and (2) whether this conduct, taken as a whole, has materially caused antitrust price injury to be inflicted indirectly on members of the Class.

92.     Plaintiffs own Harley-Davidson motorcycles covered by manufacturer warranties and purchased Harley-Davidson Compatible Parts at artificially inflated prices as a result of Harley-Davidson's anticompetitive conduct. Plaintiffs' interests are coincident with and not antagonistic to those of the other members of the Class. Plaintiffs are members of the Class, has claims that are typical of the claims of the Class members, and will fairly and adequately protect the interests of the Class. Plaintiffs and the members of the Class are similarly or identically harmed by the same systematic and pervasive concerted action.

93. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of Plaintiffs and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of the Class Representative Plaintiffs and the other members of the Class.

### 2. Rule 23(b) Prerequisites

94. In addition, the prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(3) is appropriate because:

(a) Questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(b) A class action is superior to other methods for the fair and efficient resolution of the controversy.

### FOURTH CLAIM FOR RELIEF
**(Arizona Rev. Stat. §§ 44-1401 *et seq.*)**
**(On Behalf of the Arizona Class)**

95. The allegations in the preceding paragraphs are incorporated as if fully stated herein.

96. By reason of the conduct alleged herein, Defendant has violated Arizona Rev. Stat. §§ 44-1401, *et seq.*

97. Arizona Class members purchased Harley-Davidson Compatible Parts within the State of Arizona during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

98. Through its unlawful tying scheme, Defendant acted in restraint of, or to monopolize, trade or commerce in the Compatible Parts market, a substantial part of which occurred within Arizona.

99.     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

100.    Defendant's violations of Arizona law were flagrant.

101.    Defendant's unlawful conduct substantially affected Arizona's trade and commerce.

102.    As a direct and proximate result of Defendant's unlawful conduct, members of the Arizona Class have been injured in their business or property and are threatened with further injury in that they paid and will pay supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

103.    By reason of the foregoing, members of the Arizona Class are entitled to seek all forms of relief available under Arizona Revised Stat. § 44-1401, *et seq.*

**FIFTH CLAIM FOR RELIEF**
**(California Business and Professions Code §§ 17200, *et seq.*)**
**(On Behalf of the California Class)**

104.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

105.    By reason of the conduct alleged herein, Defendant has violated California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*

106.    California Class members purchased Compatible Parts within the State of California during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

107.     In order to maintain the price of Compatible Parts at supra-competitive levels at the California Class's expense, Defendant has through its unlawful tying scheme acted to restrain and exclude competition in the Relevant Market.

108.     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, a substantial part of which occurred within California, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts market.

109.     Defendant's anticompetitive conduct was knowing and willful and constitutes a flagrant violation of Sections 17200, *et seq.*

110.     There is no pro-competitive justification for this anticompetitive conduct that outweighs its anticompetitive effects. Any possible pro-competitive benefits for such conduct could have been obtained by less restrictive alternatives.

111.     Defendant's anticompetitive conduct injured, and continues to injure members of the California Class in their business or property in that they paid and will pay supra-competitive prices for Compatible Parts due to Defendant's anticompetitive conduct.

112.     Injury to members of the California Class was a direct, foreseeable, and proximate result of Defendant's anticompetitive conduct.

113.     As a result of Defendant's violation of Sections 17200, *et seq.*, members of the California Class seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a).

<u>**SIXTH CLAIM FOR RELIEF**</u>
**(District of Columbia Code Ann. §§ 28-4501 *et seq.*)**
**(On Behalf of the District of Columbia Class)**

114.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

115.    The policy of District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices."

116.    District of Columbia Class members purchased Compatible Parts within the District of Columbia during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

117.    Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the District of Columbia Code based on the facts alleged in this Complaint, because "[a]ny indirect purchaser in the chain of manufacture, production or distribution of goods…shall be deemed to be injured within the meaning of this chapter." D.C. Code § 28-4509(a).

118.    Through its unlawful tying scheme, Defendant acted in restraint of trade within the District of Columbia, and monopolized or attempted to monopolize the market for Compatible Parts within the District of Columbia, in violation of D.C. Code § 28-4501, *et seq.*

119.    Members of the District of Columbia Class were injured and are threatened with further injury with respect to purchases of Compatible Parts in the District of Columbia in that they paid and will pay supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, and interest, reasonable attorneys' fees and costs.

## SEVENTH CLAIM FOR RELIEF
### (740 Ill. Comp. Stat. Ann. 10/3(1), et seq)
### (On Behalf of Plaintiffs Jacqueline and Robert Assise and the Illinois Class)

120.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

121.    The Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*, aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade . . . ." 740 Ill. Comp. Stat. 10/2.

122.    Plaintiffs Jacqueline and Robert Assise, and members of the Illinois Class purchased Harley Davidson Compatible Parts within the State of Illinois during the Class Period. But for the Defendant's conduct set forth herein, the price of those Compatible Parts would have been lower, in an amount to be determined at trial.

123.    Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 Ill. Comp. Stat. 10/7(2).

124.    Through its unlawful tying scheme, Defendant engaged in the restraint of trade within the Illinois, and monopolized or attempted to monopolize the market for Compatible Parts within Illinois, in violation of 740 Ill. Comp. Stat. 10/2.

125.    Plaintiffs and members of the Illinois Class were injured and are threatened with further injury with respect to purchases of Compatible Parts in Illinois, in that they paid and will pay supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, and interest; as well as reasonable attorneys' fees and costs.

28

## EIGHTH CLAIM FOR RELIEF
### (Iowa Code §§ 553.1 *et seq.*)
### (On Behalf of the Iowa Class)

126.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

127.    The Iowa Competition Law aims to "prohibit[] restraints of economic activity and monopolistic practices." Iowa Code § 553.2.

128.    Iowa Class members purchased Compatible Parts within the State of Iowa during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

129.    Defendant acted through its unlawful tying scheme to restrain or monopolize trade in the market for Compatible Parts, and attempted to establish or did in fact establish a monopoly, a substantial part of which occurred in Iowa, for the purpose of excluding competition or controlling, fixing or maintaining prices for Compatible Parts, in violation of Iowa Code §§ 553.1, *et seq.* Defendant's violations of Iowa law were willful or flagrant.

130.    Defendant's unlawful conduct substantially affected Iowa's trade and commerce.

131.    Members of the Iowa Class were injured and are threatened with further injury with respect to purchases of Compatible Parts in Iowa in that they paid and will pay supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

29

## NINTH CLAIM FOR RELIEF
### (Kansas Stat. Ann §§ 50-101 *et seq.*)
### (On Behalf of the Kansas Class)

132. The allegations in the preceding paragraphs are incorporated as if fully stated herein.

133. The Kansas Restraint of Trade Act aims to prohibit practices which, inter alia, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state." Kan. Stat. Ann. §§ 50-112.

134. Kansas Class members purchased Compatible Parts within the State of Kansas during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

135. Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Kan. Stat. Ann §§ 50-161(b).

136. Defendant acted through its unlawful tying scheme to restrain or monopolize trade in the market for Compatible Parts, and attempted to establish or did in fact establish a monopoly, a substantial part of which occurred in Kansas, for the purpose of excluding competition or controlling, fixing or maintaining prices for Compatible Parts, and in doing so precluded free and unrestricted competition among themselves in the sale of Compatible Parts, in violation of Kan. Stat. Ann. § 50-101, *et seq.*

137. Defendant's unlawful conduct substantially affected Kansas's trade and commerce.

138. Members of the Kansas Class were injured and will continue to be injured with respect to purchases of Compatible Parts in Kansas in that they paid and will pay supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

## TENTH CLAIM FOR RELIEF
### (Me. Rev. Stat. Ann. tit. 5 § 205-A, *et seq.*)
### (On Behalf of the Maine Class)

139.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

140.    By reason of the conduct alleged herein, Defendant has violated Me. Rev. Stat. Ann. tit. 5 §§ 205-A, *et seq.*

141.    Defendant acted through its unlawful tying scheme to restrain or monopolize trade in the market for Compatible Parts.

142.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Maine, for the purpose of unfairly excluding competition or controlling, fixing, or maintaining prices in the Compatible Parts Market.

143.    Class members purchased Compatible Parts within the State of Maine during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

144.    Defendant's violations of Maine law were flagrant.

145.    Defendant's unlawful conduct substantially affected Maine's trade and commerce.

146.    By reason of the foregoing, the Plaintiffs and the members of the Maine Class are entitled to seek all forms of relief, including treble damages, reasonable attorneys' fees and costs, and injunctive relief available under Me. Rev. Stat. Ann. tit. 5 § 213.

## ELEVENTH CLAIM FOR RELIEF
### (Md. Code Ann. Comm. Law §§ 11-201 *et seq.*)
### (On Behalf of the Maryland Class)

147.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

148.    Maryland class members purchased Compatible Parts within the State of Maryland during the Class Period.  But for Defendant's conduct set forth herein, the price Plaintiffs paid for Compatible Parts would have been lower.

149.    Under Md. Code Ann. Comm. Law § 11-209, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.

150.    Defendant engaged in an unlawful tying scheme, a substantial part of which occurred in Maryland to restrain or monopolize trade or commerce in the market for Compatible Parts, in violation of Md. Code Ann. Comm. Law §§ 11-201 *et seq.*

151.    Defendant's unlawful conduct substantially affected Maryland's trade and commerce.

152.    As a direct and proximate result of Defendant's conduct, members of the Maryland class were injured and are threatened with injury with respect to purchases of Compatible Parts in Maryland in that they paid and will pay supra-competitive prices for Compatible Parts.

153.    By reason of the foregoing, members of the Maryland class are entitled to all forms of relief, including actual damages, treble damages, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief available under Md. Code Ann. Comm. Law §§ 11-201.

## TWELFTH CLAIM FOR RELIEF
### (Mass. Gen. Laws ch. 93A, §§ 2, *et seq.*)
### (On Behalf of the Massachusetts Class)

154. The allegations in the preceding paragraphs are incorporated as if fully stated herein.

155. Massachusetts class members purchased Compatible Parts within the Commonwealth of Massachusetts during the Class Period. But for Defendant's conduct set forth herein, the price Plaintiffs paid for Compatible Parts would have been lower.

156. Under Mass. Gen. Laws ch. 93A §§ 9(2), 11, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.

157. Defendant engaged in an unlawful tying scheme, a substantial part of which occurred in Massachusetts, to restrain or monopolize trade or commerce in the market for Compatible Parts, in violation of Mass. Gen. Laws ch. 93A.

158. Defendant's unlawful conduct substantially affected Massachusetts' trade and commerce.

159. As a direct and proximate result of Defendant's conduct, members of the Massachusetts class were injured and are threatened with injury with respect to purchases of Compatible Parts in Massachusetts in that they paid and will pay supra-competitive prices for Compatible Parts.

160. By reason of the foregoing, members of the Massachusetts class are entitled to all forms of relief, including actual damages, treble damages, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief available under Mass. Gen. Laws ch. 93A §§ 9, 11.

33

## THIRTEENTH CLAIM FOR RELIEF
### (Michigan Compiled Laws Ann. §§ 445.771 *et seq.*)
### (On Behalf of the Michigan Class)

161.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

162.    The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce…to prohibit monopolies and attempts to monopolize trade or commerce…[and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984.

163.    Michigan Class members purchased Compatible Parts within the State of Michigan during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

164.    Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws. § 452.778(2).

165.    Defendant acted through its unlawful tying scheme, a substantial part of which occurred in Michigan, to restrain or monopolize trade or commerce in the market for Compatible Parts, in violation of Mich. Comp. Laws §§ 445.772, *et seq.*

166.    Defendant's unlawful conduct substantially affected Michigan's trade and commerce.

167.    Members of the Michigan Class were injured and are threatened with injury with respect to purchases of Compatible Parts in Michigan in that they paid and will pay supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

34

## FOURTEENTH CLAIM FOR RELIEF
### (Minnesota Ann. Stat. §§ 325D.49 *et seq.*)
### (On Behalf of the Minnesota Class)

168.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

169.    The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in Minnesota; any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain, or use monopoly power, whenever any of these affect Minnesota trade or commerce.

170.    Minnesota Class members purchased Compatible Parts within the State of Minnesota during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

171.    Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.56.

172.    Defendant engaged through its unlawful tying scheme in unreasonable restraint of trade or commerce in the market for Compatible Parts within the intrastate commerce of and outside of Minnesota; established, maintained, used, or attempted to establish, maintain, or use monopoly power over the trade or commerce in the market for Compatible Parts within the intrastate commerce of and outside of Minnesota; and fixed prices and allocated markets for Compatible Parts within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. §§ 325D.49, *et seq.*

173.    Defendant's unlawful conduct substantially affected Minnesota's trade and commerce.

174.     As a direct and proximate result of Defendant's unlawful conduct, members of the Minnesota Class have been injured in their business or property and are threatened with further injury in that they paid and will pay supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct.

175.     By reason of the foregoing, the Minnesota Class is entitled to seek all forms of relief available under Minnesota Stat. §§ 325D.49, *et seq.*

**FIFTEENTH CLAIM FOR RELIEF**
**(Mo. Ann. Stat. §§ 407.010,** *et seq.***)**
**(On Behalf of the Missouri Class)**

176.     The allegations in the preceding paragraphs are incorporated as if fully stated herein.

177.     Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

178.     Members of the Missouri Class purchased Compatible Parts within the State of Missouri during the Class Period. But for Defendant's conduct set forth herein, the price per pound of Compatible Parts would have been lower.

179.     Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint.

180.     Through its unlawful tying scheme, Defendant engaged in restraint of trade or commerce of Compatible Parts within the intrastate commerce of Missouri, and monopolized or attempted to monopolize the market for Compatible within the intrastate commerce of Missouri by possessing monopoly power in the market and willfully maintaining that power through the tying of Compatible Parts to the sales of its motorcycles in violation of Mo. Ann. Stat. § 407.010, *et seq.*

36

181.     Members of the Missouri Class were injured with respect to purchases of Compatible Parts in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

## SIXTEENTH CLAIM FOR RELIEF
### (Nebraska Rev. Stat. §§ 59-801 *et seq.*)
### (On Behalf of the Nebraska Class)

182.     The allegations in the preceding paragraphs are incorporated as if fully stated herein.

183.     Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

184.     Nebraska Class members purchased Compatible Parts within the State of Nebraska during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

185.     Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-821.

186.     Through its unlawful tying scheme, Defendant engaged in restraint of trade or commerce of Compatible Parts within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the market for Compatible Parts within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power, in violation of Neb. Rev. Stat. §§ 59-801, *et seq.*

187.     Defendant's unlawful conduct substantially affected Nebraska's trade and commerce.

188.    Members of the Nebraska Class were injured and will continue to be injured with respect to purchases of Compatible Parts in Nebraska in that they paid and will pay supra-competitive prices for Compatible Parts due to Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

### SEVENTEENTH CLAIM FOR RELIEF
**(Nevada Rev. Stat. Ann. §§ 598A.010 *et seq.*)**
**(On Behalf of the Nevada Class)**

189.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

190.    The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities…is necessary to the economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).

191.    Nevada Class members purchased Compatible Parts within the State of Nevada during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

192.    The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open and competitive market, and to penalize all persons engaged in anticompetitive practices. Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, inter alia, price fixing, division of markets, allocation of customers, and monopolization of trade. Nev. Rev. Stat. Ann. § 598A.060.

193.    Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. § 598A.210(2).

194. Defendant acted through its unlawful tying scheme to restrain the trade of Compatible Parts in Nevada and monopolized or attempted to monopolize trade or commerce of Compatible Parts, and willfully maintain that monopoly, within the intrastate commerce of Nevada, in violation of Nev. Rev. Stat. Ann. §§ 598A, *et seq.*

195. Defendant's unlawful conduct substantially affected Nevada's trade and commerce.

196. Members of the Nevada Class were injured and are threatened with injury with respect to purchases of Compatible Parts in Nevada in that at least thousands of sales of Defendant's Compatible Parts took place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by Defendant's conduct.

197. Accordingly, members of the Nevada Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

## EIGHTEENTH CLAIM FOR RELIEF
### (New Hampshire Rev. Stat. §§ 356:1 *et seq.*)
### (On Behalf of the New Hampshire Class)

198. The allegations in paragraphs 1-151 are incorporated as if fully stated herein.

199. Title XXXI of the New Hampshire Statutes generally governs trade and commerce. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. N.H. Rev. Stat. Ann. §§ 356:2, 3.

200. New Hampshire Class members purchased Compatible Parts within the State of New Hampshire during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

201. Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

202.     Through its unlawful tying scheme, defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts Market, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred in New Hampshire, in violation of N.H. Rev. Stat. Ann. §§ 356:1, *et seq.*

203.     Members of the New Hampshire Class were injured and are threatened with injury with respect to purchases of Compatible Parts in New Hampshire in that they paid more and will continue to pay more for Compatible Parts than they otherwise would in the absence of Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

**NINETEENTH CLAIM FOR RELIEF**
**(New Mexico Stat. Ann. §§ 57-1-1 *et seq.*)**
**(On Behalf of the New Mexico Class)**

204.     The allegations in the preceding paragraphs are incorporated as if fully stated herein.

205.     The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices. N.M. Stat. Ann. § 57-1-15.

206.     New Mexico Class members purchased Compatible Parts within the State of New Mexico during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

207.     Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3.

208. Defendant engaged in the restraint of trade through its unlawful tying scheme and monopolized or attempted to monopolize trade for Compatible Parts within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. §§ 57-1-1, *et seq.*

209. Defendant's unlawful conduct substantially affected New Mexico's trade and commerce.

210. Members of the New Mexico Class were injured and will continue to be injured with respect to purchases of Compatible Parts in New Mexico in that they paid more and will continue to pay more for Compatible Parts than they otherwise would in the absence of Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

### TWENTIETH CLAIM FOR RELIEF
**(The Donnelly Act, New York General Bus. Law §§ 340 *et seq.*)**
**(On Behalf of the New York Class)**

211. The allegations in the preceding paragraphs are incorporated as if fully stated herein.

212. Article 22 of the New York General Business Law general prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law § 340(1).

213. New York Class members purchased Compatible Parts within the State of New York during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

214. Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

215.     Through its unlawful tying arrangement, Defendant established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of Compatible Parts and restrained competition in the free exercise of the conduct of the business of Compatible Parts within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law §§ 340, *et seq.*

216.     Defendant's unlawful conduct substantially affected New York's trade and commerce.

217.     Members of the New York Class were injured and are threatened with further injury with respect to purchases of Compatible Parts in New York in that they paid more and will continue to pay more for Compatible Parts than they otherwise would in the absence of Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees.

### TWENTY-FIRST CLAIM FOR RELIEF
**(North Carolina General Stat. §§ 75-1 *et seq.*)**
**(On Behalf of the North Carolina Class)**

218.     The allegations in the preceding paragraphs are incorporated as if fully stated herein.

219.     By reason of the conduct alleged herein, Defendant has violated N.C. Gen. Stat. §§ 75-1.1, *et seq.*

220.     North Carolina Class members purchased Compatible Parts within the State of North Carolina during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

42

221. Through the unlawful tying scheme, Defendant engaged in restraint of trade or commerce in the Compatible Parts market, a substantial part of which occurred within North Carolina.

222. Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Compatible Parts market, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within North Carolina.

223. Defendant's conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

224. Defendant's trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

225. Defendant's conduct misled consumers, withheld material facts, and resulted in material misrepresentations to members of the North Carolina Class.

226. Defendant's unlawful conduct substantially affected North Carolina's trade and commerce.

227. As a direct and proximate result of Defendant's unlawful conduct, members of the North Carolina Class have been injured in their business or property and are threatened with further injury in that they paid more and will continue to pay more for Compatible Parts than they otherwise would in the absence of Defendant's unlawful conduct.

228. By reason of the foregoing, members of the North Carolina Class are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. §§ 75-1, *et seq.*

## TWENTY-SECOND CLAIM FOR RELIEF
### (North Dakota Century Code §§ 51-08.1-01 *et seq.*)
### (On Behalf of the North Dakota Class)

229. The allegations in the preceding paragraphs are incorporated as if fully stated herein.

230. The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. N.D. Cent. Code §§ 51-08.1, *et seq.*

231. North Dakota Class members purchased Compatible Parts within the State of North Dakota during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

232. Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. Cent. Code § 51-08.1-08.

233. Through its unlawful tying scheme, Defendant engaged acted to restrain, or to monopolize trade or commerce in the market for Compatible Parts, and established, maintained, or used a monopoly, or attempted to do so, a substantial part of which occurred within North Dakota, for the purposes of excluding competition or controlling, fixing, or maintaining prices for Compatible Parts, in violation of N.D. Cent. Code §§ 51-08.1-02, 03.

234. Defendant's violations of North Dakota law were flagrant.

235. Defendant's unlawful conduct substantially affected North Dakota's trade and commerce.

236. Members of the North Dakota Class were injured and will continue to be injured with respect to purchases in North Dakota in that they paid more and will continue to pay more for Compatible Parts than they otherwise would in the absence of Defendant's unlawful conduct, and

are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief.

## TWENTY-THIRD CLAIM FOR RELIEF
### (Oregon Revised Statutes §§ 646.705 *et seq.*)
### (On Behalf of the Oregon Class)

237.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

238.    Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 899 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." Or. Rev. Stat. § 646.715.

239.    Oregon Class members purchased Compatible Parts within the State of Oregon during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

240.    Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. § 646.780(1)(a).

241.    Through its unlawful tying scheme, Defendant engaged in restraint of trade or commerce of Compatible Parts, and monopolized or attempted to monopolize the trade or commerce of Compatible Parts, and maintain that monopoly, a substantial part of which occurred within Oregon, in violation of Or. Rev. Stat. §§ 646.705, *et seq.*

242.    Defendant's unlawful conduct substantially affected Oregon's trade and commerce.

243.    Members of the Oregon Class were injured with respect to purchases of Compatible Parts within the intrastate commerce of Oregon, or alternatively to interstate commerce involving

actual or threatened injury to persons located in Oregon, in that they paid more and will continue to pay more for Compatible Parts than they otherwise would in the absence of Defendant's unlawful conduct.

244.    Members of the Oregon Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

**TWENTY-FOURTH CLAIM FOR RELIEF**
**(Rhode Island Antitrust Act, Rhode Island Gen. Law §§ 6-36-1 *et seq.*)**
**(On Behalf of the Rhode Island Class)**

245.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

246.    The Rhode Island Antitrust Act aims to promote the unhampered growth of commerce and industry throughout Rhode Island by prohibiting unreasonable restraints of trade and monopolistic practices that hamper, prevent, or decrease competition. R.I. Gen. Laws § 6-36-2(a)(2).

247.    Rhode Island Class members purchased Compatible Parts within the State of Rhode Island during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

248.    Under the Rhode Island Antitrust Act, as of July 15, 2013, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws § 6-36-11(a).

249.    Through its unlawful tying scheme, Defendant engaged in the restraint of trade of Compatible Parts within the intrastate commerce of Rhode Island, and established, maintained, or used, or attempted to establish, maintain, or use, a monopoly in the trade of Compatible Parts for

the purpose of excluding competition or controlling, fixing, or maintaining prices within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws §§ 6-36-1, *et seq.*

250.    Members of the Rhode Island Class were injured and will continue to be injured with respect to purchases of Compatible Parts in Rhode Island in that they paid more and will continue to pay more for Compatible Parts than they otherwise would in the absence of Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

**TWENTY-FIFTH CLAIM FOR RELIEF**
**(South Dakota Codified Laws §§ 37-1-3.1 *et seq.*)**
**(On Behalf of the South Dakota Class)**

251.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

252.    Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies, and discriminatory trade practices. S.D. Codified Laws §§ 37-1- 3.1, 3.2.

253.    South Dakota Class members purchased Compatible Parts within the State of South Dakota during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

254.    Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. S.D. Codified Laws § 37-1-33.

255.    Through its unlawful tying scheme, Defendant engaged in restraint of trade or commerce of Compatible Parts within the intrastate commerce of South Dakota, and monopolized or attempted to monopolize trade or commerce of Compatible Parts, and willfully maintain that

monopoly, within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws §§ 37-1, *et seq.*

256.    Defendant's unlawful conduct substantially affected South Dakota's trade and commerce.

257.    Members of the South Dakota Class were injured and will continue to be injured with respect to purchases of Compatible Parts in South Dakota in that they paid more and will continue to pay more for Compatible Parts than they otherwise would in the absence of Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

**TWENTY-SIXTH CLAIM FOR RELIEF**
**(Tennessee Code Ann. §§ 47-25-101 *et seq.*)**
**(On Behalf of the Tennessee Class)**

258.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

259.    By reason of the conduct alleged herein, Defendant has violated Tennessee Code Ann. §§ 47-25-101, *et seq.*

260.    Tennessee Class members purchased Compatible Parts within the State of Tennessee during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

261.    Defendant has engaged in unlawful practices which tend to advance or control the price or the cost to end users in the Compatible Parts market throughout Tennessee.

262.    Through its unlawful tying scheme, Defendant engaged in restraint of trade or commerce of Compatible Parts within the intrastate commerce of Tennessee, and monopolized or attempted to monopolize trade or commerce of Compatible Parts within the intrastate commerce

of South Dakota, and maintain that monopoly, in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.*

263.    As a direct and proximate cause of Defendant's unlawful conduct, members of the Tennessee Class have been injured in their business or property and are threatened with further injury in that they paid more and will continue to pay more for Compatible Parts than they otherwise would in the absence of Defendant's unlawful conduct.

264.    By reason of the foregoing, members of the Tennessee Class are entitled to seek all forms of relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

**TWENTY-SEVENTH CLAIM FOR RELIEF**
**(Utah Code Ann. §§ 76-10-3101 *et seq.*)**
**(On Behalf of the Utah Class)**

265.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

266.    The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce . . . ." Utah Code Ann. § 76-10-3102.

267.    Utah Class members purchased Compatible Parts within the State of Utah during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

268.    Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

49

269. Through its unlawful tying scheme, the Defendant engaged in the restraint of trade or commerce of Compatible Parts, and monopolized or attempted to monopolize trade or commerce of Compatible Parts, and maintain that monopoly, in violation of Utah Code Ann. §§ 76-10-3101, *et seq.*

270. Members of the Utah Class who are either Utah residents or Utah citizens were injured and will continue to be injured with respect to purchases of Compatible Parts in Utah in that they paid more and will continue to pay more for Compatible Parts than they otherwise would in the absence of Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

### TWENTY-EIGHTH CLAIM FOR RELIEF
**(Vermont Stat. Ann. §§ 2453 *et seq.*)**
**(On Behalf of the Vermont Class)**

271. The allegations in the preceding paragraphs are incorporated as if fully stated herein.

272. By reason of the conduct alleged herein, Defendant has violated the Vermont Statutes Annotated.

273. Vermont Class members purchased Compatible Parts within the State of Vermont during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

274. Through its unlawful tying scheme, the Defendant engaged in the restraint of trade or commerce of Compatible Parts, and monopolized or attempted to monopolize trade or commerce of Compatible Parts, and maintain that monopoly, in violation of Vermont Stat. Ann. §§ 2453 *et seq.*

50

275.    Defendant's conduct has and had anticompetitive effects in the Compatible Parts market, as supra-competitive prices for Compatible Parts are passed on to end users.

276.    Defendant's unlawful conduct substantially affected Vermont's trade and commerce.

277.    As a direct and proximate result of Defendant's unlawful conduct, members of the Vermont Class have been injured in their business or property and are threatened with further injury in that they paid and will continue to pay more for Compatible Parts than they otherwise would in the absence of Defendant's unlawful conduct.

278.    By reason of the foregoing, members of the Vermont Class are entitled to seek all forms of relief available under Vermont Stat. Ann. §§ 2453 *et seq.*

## TWENTY-NINTH CLAIM FOR RELIEF
### (Va. Code Ann. 59.1-196 et seq )
### (On Behalf of the Virginia Class)

279.    The allegations in the preceding paragraphs are incorporated as if fully stated herein.

280.    Defendant's actions complained of herein constitute a violation of the Virginia Consumer Protection Act, Va. Code Ann. §§ 59.1-196 *et seq.*

281.    Defendant has engaged with respect to Plaintiffs in practices prohibited by the Virginia Consumer Protection Act, including the restraint of trade and commerce and other anticompetitive conduct alleged above in violation of Va. Code Ann. §§ 59.1-9.1 *et seq.*

282.    Defendant's anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the Virginia Consumer Protection Act.

283.    Defendant's unlawful conduct substantially affected Virginia's trade and commerce.

51

284. Through its unlawful tying scheme, the Defendant engaged in the restraint of trade or commerce of Compatible Parts, and monopolized or attempted to monopolize trade or commerce of Compatible Parts and maintain that monopoly, in violation of Va. Code Ann. §§ 59.1-196 *et seq.*

285. As a direct and proximate result of Defendant's unlawful conduct, members of the Virginia Class have been injured in their business and property in that they paid more for Compatible Parts than they otherwise would have paid in the absence of Defendant's unlawful conduct.

286. As a result of Defendant's violation of Section 59.1-9.1 of the Virginia Consumer Protection Act, members of the Virginia Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to section 59.1-9.1 of the Virginia Code.

**THIRTIETH CLAIM FOR RELIEF**
**(West Virginia Code §§ 47-18-1 *et seq.*)**
**(On Behalf of the West Virginia Class)**

287. The allegations in the preceding paragraphs are incorporated as if fully stated herein.

288. The violations of federal antitrust law set forth above also constitute violations of section 47-18-1 of the West Virginia Code.

289. West Virginia Class members purchased Compatible Parts within the State of West Virginia during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

290. During the Class Period, through its unlawful tying scheme, the Defendant engaged in the restraint of trade or commerce of Compatible Parts, and monopolized or attempted to

monopolize trade or commerce of Compatible Parts and maintain that monopoly, alleged above in violation of W. Va. Code §§ 47-18-1, *et seq.*

291. Defendant's anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the West Virginia Antitrust Act.

292. Defendant's unlawful conduct substantially affected West Virginia's trade and commerce.

293. As a direct and proximate result of Defendant's unlawful conduct, members of the West Virginia Class have been injured in their business and property in that they paid more for Compatible Parts than they otherwise would have paid in the absence of Defendant's unlawful conduct.

294. As a result of Defendant's violation of Section 47-18-3 of the West Virginia Antitrust Act, members of the West Virginia Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to section 47-18-9 of the West Virginia Code.

**THIRTY-FIRST CLAIM FOR RELIEF**
**(Wisconsin Stat. §§ 133.01 *et seq.*)**
**(On Behalf of the Wisconsin Class)**

295. The allegations in the preceding paragraphs are incorporated as if fully stated herein.

296. Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. § 133.01.

53

297. Wisconsin Class members purchased Compatible Parts within the State of Wisconsin during the Class Period. But for Defendant's conduct set forth herein, the price of Compatible Parts would have been lower.

298. Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. Wis. Stat. 133.18(a).

299. Through its unlawful tying scheme, a substantial part of which occurred within Wisconsin, the Defendant engaged in the restraint of trade or commerce of Compatible Parts, and monopolized or attempted to monopolize trade or commerce of Compatible Parts and maintain that monopoly, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. §§ 133.01, *et seq.*

300. Members of the Wisconsin Class were injured with respect to purchases of Compatible Parts in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with consumers in Wisconsin paying substantially higher prices for Defendant's Compatible Parts in Wisconsin.

301. Accordingly, members of the Wisconsin Class are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

## **PRAYER FOR RELIEF**

302. WHEREFORE, Plaintiffs individually and as members of the proposed Federal Indirect-Purchaser Injunctive Class and the State Classes pray that:

A. This Court find that Defendant's conduct constitutes violations of the Sherman Act, 15 U.S.C. §§ 1, 2 and the Clayton Act, 15 U.S.C. § 14;

B.     This Court award injunctive relief to the proposed injunctive Class under Section 16 of the Clayton Act, 15 U.S.C. § 26, and award damage relief to the proposed damage Classes in the Indirect-Purchaser Jurisdictions pursuant to its supplemental jurisdiction;

C.     Plaintiffs recover reasonable attorneys' fees and costs as allowed by law;

D.     Plaintiffs recover pre-judgment and post-judgment interest at the highest rate allowed by law; and

E.     Plaintiffs be granted such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: November 3, 2022

*s/ Carl V. Malmstrom*
Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, IL 60604
Tel: (312) 984-0000
Fax: (212) 545-4653
malmstrom@whafh.com

Thomas H. Burt
Lillian R. Grinnell
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Tel: (212) 545-4600
Fax: (212)545-4653
burt@whafh.com
grinnell@whafh.com

55